**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Ex rel. Martin Schell*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Martin Schell, individually, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-04019 |
| | ) | |
| BLUEBIRD MEDIA, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Relator Martin Schell filed this lawsuit against Defendants Bluebird Media and

Bluebird Network alleging violations of the False Claims Act and Missouri Service Letter

statute.  Bluebird[1] now seeks summary judgment on all counts of Schell's Complaint.

[Doc. 66].  For the reasons set forth below, Defendants' motion for summary judgment is

GRANTED.

**I.     Uncontroverted Material Facts**

In March 2010, Bluebird submitted an application to the National

Telecommunications and Information Administration (NTIA) to receive grant funds

under the Broadband Technology Opportunities Program (BTOP).  Under the BTOP,

companies like Bluebird could receive grant funds to construct broadband infrastructure

---

[1] In January 2011, Bluebird Media merged with Missouri Network Alliance to form Bluebird Network.  The Court
will refer to Bluebird Media and Bluebird Network as "Bluebird" throughout this Order unless it is necessary to
distinguish between the two.

1

in underserved areas of the state. As part of the application, Bluebird was required to verify that the area it sought to serve was "underserved," that the project would provide broadband accessibility to Community Anchor Institutions (CAIs) such as schools, libraries, hospitals, and prisons, that it could provide non-federal funding as part of a cash-match requirement, and that only it would manage the grant project. After providing the NTIA with several documents in response to questions about Bluebird's grant application, Bluebird was awarded a grant in July 2010. The grant period was from August 2010 to July 2013, and Bluebird received grant disbursements throughout that period. As part of the grant's requirements, Bluebird had an ongoing obligation to submit quarterly reports to the NTIA, maintain regular communication with NTIA officers assigned to Bluebird's project, and to participate in site visits.

In January 2011, after the grant was awarded to Bluebird Media, Bluebird Media merged with Missouri Network Alliance (MNA) to form Bluebird Network. Bluebird Media owns 51% of Bluebird Network and MNA owns 49%. Bluebird Network's board of directors was composed of five members selected by each company. All management decisions are made by majority vote of this board. In January 2011, Bluebird notified the NTIA of this merger, of Bluebird Network's ownership makeup, and of the composition of the board. [Doc. 72-2].

## A. Underserved

In its grant application, Bluebird represented that the area it would serve was underserved. The NTIA subsequently requested that Bluebird describe the methodology it used to come to this conclusion and requested that Bluebird provide statistical data

2

related to broadband availability. Bluebird submitted a map of Missouri detailing broadband access in the state; the map was developed by the Missouri Office of Administration. [Doc. 72-7]. The Missouri Office of Administration also submitted supporting documentation to the NTIA illustrating that the area Bluebird sought to serve was underserved, as determined by the State during a previous grant application process. [Doc. 67-1, at pp. 1-2, ¶ 8 – Aff. of Kelvin Simmons, Comm'r of the Mo. OA].

## B. Community Anchor Institutions

Bluebid's application stated that the project would directly connect approximately 72 CAIs and would be available to approximately 476 other key institutions. [Doc. 67-2, at p. 22]. The application did not list the specific institutions to be served by the project, but it was understood by Bluebird and the NTIA that the list of CAIs to be connected would be fluid and subject to change. After receiving the grant, Bluebird submitted an updated project plan stating that the project would serve 51 unidentified CAIs. Thereafter, Bluebird submitted a proposal to NTIA outlining changes to its proposed network, and the NTIA approved the changes. A list of the specific CAIs served by the project was not disclosed to the NTIA until November 2012, when Bluebird identified that it would serve 102 CAIs rather than 51. [Doc. 72-34].

## C. Non-Federal Funding

In order to receive approximately $45.8 million in grant funds, Bluebird was required to verify that it could match the funds with approximately $19.6 million in non-federal funds. In its application, Bluebird disclosed to the NTIA that its non-federal funding requirement could be met with a $10 million loan from Advantage Capital

Partners, a $9.158 million loan from Boone County National Bank, and a $10.5 million in-kind contribution from the State of Missouri. [Doc. 67-2].

As to the cash contribution from Boone County National Bank, the Bank provided letters of support to Bluebird – which were in turn submitted to the NTIA in June 2010 – containing "proposed loan terms" that were "subject to all normal and customary underwriting guidelines as directed and approved by our Board of Directors and Central Bancompany." [Doc. 72-10]. Nothing in these letters indicates that Bluebird would be unconditionally entitled to a loan or that a loan was already approved.

As to the in-kind contribution, Bluebird identified Missouri as a source for the $10.5 million in-kind contribution, which would be in the form of access to public rights-of-way. No formalized agreement between Missouri and Bluebird existed at the time of the application and negotiations between the two took several months. NTIA knew during the due diligence process that an agreement between Bluebird and Missouri had not been formalized. [Doc. 88, at p. 20, ¶ 62]. Bluebird updated NTIA about the status of its agreement and included letters from state agencies detailing the value of their contributions and the discounted services and benefits they would receive as a result. [Doc. 88, at p. 20, ¶ 61]. In July 2011, agreements were executed between Bluebird and Missouri, and those agreements were shared with an NTIA representative during a site visit. In May 2012, the NTIA requested that Bluebird finalize the valuation for the in-kind contribution. An independent party appraised the valuation of the parcels and rights-of-way, and this appraisal was submitted to and approved by the NTIA in August 2012. [Doc. 88, at p. 24, ¶ 76]; [Doc. 72-23].

4

Bluebird ultimately met its non-federal funding requirement through a $10.5 million in-kind contribution from the State of Missouri and from financing and cash flow from its joint venture with MNA, and therefore, did not require a loan from Boone County National Bank.

### D.  Management of the Grant Project

Bluebird was awarded the grant on the condition that only it would manage the administration of the project.  A specific condition of the grant was that GlenMartin, a separate company owned by Tatum and Chris Martin, two of Media's owners and board members, would have no role in the management of the grant project.   In response to this requirement, in June 2010, the managing member of Bluebird submitted a signed letter informing the NTIA that Bluebird would be solely responsible for the management of the project, that GlenMartin would have no rule in the management of Bluebird, and that to the extent GlenMartin would be associated with Bluebird, it would only be as a potential subcontractor who would be required to participate in a competitive bid process. [Doc. 72-27].

### E.  Relator Martin Schell's Employment with Bluebird

Beginning in October 2010, Relator Martin Schell served as an independent contractor to Bluebird Media and acted as Bluebird Media's Vice President of Business Development.  After Bluebird Media merged with MNA to form Bluebird Network, Schell was hired by Bluebird Network as a salaried employee in January 2011.  Schell served as Bluebird's Vice President of Operations until his termination in October 2011.  Though Bluebird had already submitted its grant application to the NTIA by the time

Schell began working, he was given various projects related to the grant. During his employment with Bluebird, Schell raised concerns to his boss, Bluebird CEO Eric Fogle, about the validity of the in-kind contribution Bluebird sought from the State of Missouri. He also raised concerns that after the merger with MNA, MNA board members were causing specific service areas to be "redlined" so that Bluebird could not compete with MNA's existing services in those areas and consequently, Bluebird could not reach certain CAIs in the area. At around the same time Schell raised concerns about the validity of the in-kind contribution and Fogle relayed those concerns to Bluebird's board, the board voted to terminate Schell. In response to his request, Bluebird provided Schell with a service letter identifying its reason for his termination. The letter states Schell was terminated due to the elimination of his position in the company. The position of Vice President of Operations has not been reinstated since Schell's termination and his duties were transferred to other Bluebird employees.

## II. Discussion

### A. Count I – Submission of a False Claim, 31 U.S.C. § 3729

Schell alleges in his Complaint that Bluebird violated the False Claims Act by misrepresenting to the NTIA that the area it sought to serve was underserved, that it would serve specific CAIs, that it would receive non-federal financing from Boone County National Bank, that it received adequate in-kind contributions from the State of Missouri, and that the grant project would not be managed by Tatum Martin, Chris Martin, or GlenMartin, Inc. Schell also appears to allege that Bluebird Media no longer managed the grant project once it merged with MNA to form Bluebird Network.

6

Bluebird argues summary judgment is appropriate on Count I because Schell cannot, as a matter of law, show Bluebird's actions and statements were knowingly false or material to the NTIA's award of grant funds to Bluebird.

The False Claims Act imposes liability on anyone who "(1) 'knowingly presents, or causes to be presented, [to a federal official] a false or fraudulent claim for payment or approval,' or (2) 'knowingly makes ... a false record or statement to get a false or fraudulent claim paid or approved.'" *U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) (quoting 31 U.S.C. § 3729(a)(1)-(2)). To state a prima facie case under the Act, the relator must show "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *U.S. ex rel. Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012). Additionally, for liability to attach, the fraudulent claim must be "material" to the government's decision to disperse money. *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011).

### 1. Underserved Areas

Schell alleges in his Complaint that Bluebird falsely stated to the NTIA that the area it intended to provide broadband services to was underserved. Bluebird argues there is no genuine issue of material fact as to whether the area to be served by Bluebird was underserved and therefore, the statements to the NTIA were not false.

The Broadband Technology Opportunities Program (BTOP) classifies an area as "underserved" where "(i) No more than 50 percent of the households in the Last Mile or Middle Mile service area have access to facilities-based, terrestrial broadband service at

7

greater than the minimum broadband transmission speed (set forth in the definition of broadband above); [or] . . . (iii) the rate of terrestrial broadband subscribership for the Last Mile or Middle Mile service area is 40 percent of households or less." Broadband Technology Opportunities Program, 75 Fed. Reg. 3792-01, at p. 3798 (Jan. 10, 2010). Bluebird stated in its grant application that the area it wished to serve was underserved because of both reasons above and that it came to this conclusion with the assistance of the State of Missouri's Office of Administration and by studying maps and existing fiber routes. [Doc. 88, at p. 13, ¶ 38]. When the NTIA requested additional information from Bluebird, Bluebird described the methodology it used and provided supporting documentation from the State of Missouri, which had previously "conducted due diligence to determine the area was underserved . . . ." [Doc. 67, at p. 3, ¶ 9]. The NTIA found this data and the accompanying methodology sufficient to satisfy the underserved requirement of the grant application, as evidenced by its award of the grant funds.

Schell states the area was not underserved because "there [were] a plethora of service providers in the area and an existing 3,000-mile fiber optic network that weaves in and out of the 59 counties . . . ." [Doc. 1, at p. 5, ¶ 21]. However, Schell concedes that neither the number of service providers in the area nor the existing length of the fiber optic network in the area is included in the NTIA's definition of "underserved." [Doc. 88, at p. 16, ¶ 46.]. To the extent Schell claims Bluebird made a false claim by omitting this information from its grant application, it does not constitute a false claim because this information was not part of the definition of an underserved area. *See generally U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 831-32 (8th Cir. 2013) (holding that where a

8

relator alleges a defendant's failure to disclose constitutes a false claim under the FCA, the relator must point to a clear requirement – statutory or otherwise – obligating the defendant to do so).  Schell also states that the area was not underserved because prior to its merger with Bluebird Media, MNA sent "up to 20 letters to NTIA objecting to [Media] being awarded the NTIA [grant] on the basis that the area was not underserved." [Doc. 88, at p. 46, ¶ 142 – Aff. of Eric Fogle].  Mr. Fogle's statements about these letters is hearsay, and Schell has not provided any of the letters to the Court, has not stated on what basis MNA determined the areas to be underserved, and has provided no evidence to suggest the areas were in fact underserved.  Therefore, Schell has failed to present submissible evidence that Bluebird made false statements to the NTIA about the area being underserved.

### 2.    *Community Anchor Institutions and Redlining*

Schell further alleges in his Complaint that Bluebird represented to the NTIA that it would serve specific CAIs, but later excluded some interested CAIs when MNA took "effective control over the grant" post- merger and "redlined" territories serviced by MNA. [Doc. 1, at p. 12, ¶ 70].  It appears Schell alleges Bluebird's promise in the grant proposal to serve certain CAIs and its later exclusion of specific CAIs constitutes an actionable false claim.  However, Bluebird's grant application contained no promise to connect to any specific CAI location and therefore, Schell has not established a false statement was made.  Instead, the application stated it would serve approximately 72 CAIs – a number Bluebird would later reduce to 51 and finally increase to 102.  Schell concedes that it was not until November 2012 that Bluebird provided the NTIA with a

9

specific list of CAIs, and that prior to that time, proposed route changes and CAI amendments were submitted to and approved by the NTIA. [Doc. 88, at p. 33, ¶¶ 96-97, 100-01].

Likewise, Schell's argument that Bluebird Media's merger with MNA resulted in redlining of specific areas Bluebird once promised to serve also fails to establish a material misrepresentation because specific CAIs were only disclosed to the NTIA after the merger. Schell argues in his reply that Bluebird "never explicitly informed the NTIA that it would only connect to CAIs that were not already serviced by the existing _and substantial_ MNA member network; rather, Defendants states that they would connect to CAIs through their service area . . . ." [Doc. 93, at p. 13) (emphasis in original). However, Schell has not identified any provision of the grant application or any BTOP requirement that requires an applicant to be the sole provider of services in the region or to verify that it will provide access to every potential customer or institution in the area. Further, Schell concedes the NTIA was notified and approved of the joint venture between Bluebird Media and MNA. [Doc. 88, at p. 4, ¶ 12].  Accordingly, Schell has presented no evidence that Bluebird made a false claim to the NTIA concerning the CAIs it would serve.

### 3. *Bank Financing Letter*

Schell argues Bluebird made a false statement to the NTIA when it misrepresented the status of a $9.158 million loan from Boone County National Bank. Bluebird argues summary judgment is appropriate because statements about funding from Boone County National Bank in the application were neither false nor material.

10

Schell argues Bluebird misrepresented the status of it loans with Boone County National Bank in four ways. First, Schell argues Bluebird represented to the NTIA that Boone County National Bank would be *the* source of non-federal funding and that Bluebird's decision to instead use funding from its merger with MNA constitutes a false statement. There is no evidence to support this argument. Bluebird's grant application does not list Boone County National Bank as the only source for cash funds, and in fact lists an alternative source of financing that would have been independently sufficient. Further, Schell cannot establish that a loan from Boone County National Bank was material to the NTIA's decision to award the grant. Schell concedes that Bluebird was awarded a grant and subsequent grant payments despite the fact that the NTIA was aware a loan was not finalized between Boone County National Bank and Bluebird and that Bluebird informed the NTIA that "the cash match will not be in a loan from Boone County National Bank." [Doc. 88, at p. 19, ¶ 57].

Second, Schell argues Bluebird represented to the NTIA that the loan was "almost closed." However, Schell's support for this allegation is his own affidavit which states that he expressed his "concern for the way [Bluebird] had presented the potential loan from the Boone County Bank as almost closed . . . ." [Doc. 88-1, at p. 4, ¶ 17]. Schell's sworn statement that he was concerned with how Bluebird represented the loan to the NTIA is not sufficient to support an allegation that Bluebird actually represented the loan in this way. This is especially so in light of Boone County National Bank's letters of interest submitted to the NTIA, which contained "proposed loan terms" and as Schell concedes, were not unconditional promises to approve a loan.

Third, Schell argues that even if the letters were only letters of interest, Bluebird never had an intention to secure funds from Boone County National Bank, and therefore, placing the Bank on the grant application as even a potential source of funding was a false statement. In support of this claim, Schell cites to the deposition of Eric Fogle who testified that another Bluebird executive, Chris Bach, told him Boone County National Bank was not a legitimate source of funds. What Chris Bach told Eric Fogle is hearsay and is therefore inadmissible. Fed. R. Civ. Pro. 56(c)(2). Hearsay aside, as discussed above, Schell cannot establish materiality.

Lastly, Schell argues Boone County National Bank never had an intention to loan the money to Bluebird and that the letters of interest were provided only as a personal favor to Bluebird's managing member. Schell cites no evidence in support of this allegation other than to a statement by Eric Fogle that, as the person in charge of securing financing for the grant, he never approached Boone County National Bank about a loan. This evidence alone is insufficient to support Schell's allegations that Boone County National Bank was not a potential lender at the time Bluebird submitted its grant application. Even more, Schell cannot establish materiality.

### 4. *"In-Kind" Contribution*

Schell further alleges Bluebird falsely classified a $10.5 million contribution of land and rights-of-way from the State of Missouri as an in-kind contribution without also notifying the NTIA that in return for the contribution, the State of Missouri was receiving heavily discounted services from Bluebird. It is undisputed that at the time Bluebird submitted its grant application, the State of Missouri was identified as its source for the

$10.5 million in-kind contribution and that the State of Missouri would "get heavily discounted Bandwidth rates" as a result. [Doc. 67-2, at p. 30]. Bluebird also supplied the NTIA with letters from state agencies detailing the value of their contributions and the discounted services and benefits they would receive as a result. [Doc. 88, at p. 20, ¶ 61].

Schell argues that an in-kind contribution exists only where the recipient is not expected to provide a reciprocal benefit. He reasons that by his own calculations, because Bluebird provided the State of Missouri with discounted services, the State of Missouri's in-kind contribution only amounted to $6.225 million rather than the $10.5 million Bluebird needed. This argument is unpersuasive. First, Schell contends an in-kind contribution is "that which does not entail a requirement of reciprocal services" and cites to case law unrelated to the BTOP interpreting "contribute" to mean "to give or donate." [Doc. 93 at p. 8]. However, Schell cites to no provision within the BTOP requiring in-kind contributions to be donated with no strings attached. *See* 20 C.F.R. § 14.2(nn) (a "[t]hird party in-kind contributions means the value of non-cash contributions provided by non-Federal third parties. Third-party in-kind contribution may be in the form of real property, equipment, supplies and other expendable property, and the value of goods and services directly benefitting and specifically identifiable to the project or program."). Schell also concedes he does not know whether the agreement between Bluebird and the State of Missouri qualifies as an in-kind contribution. [Doc. 88, at p. 23, ¶ 74]. Second, Schell cannot point to a particular, material misrepresentation made by Bluebird to the NTIA. The agreement between Bluebird and the State of Missouri was presented to an NTIA representative for review during a site visit and was submitted to

13

an independent appraiser for valuation. The NTIA reviewed the appraisal and ultimately approved Bluebird's source of in-kind funding. [Doc. 88, at p. 24, ¶ 76]; [Doc. 72-23].

Schell next argues that although an independent appraisal was performed and submitted to and approved by the NTIA, he has since reviewed the valuation and believes "the analysis to be seriously flawed" because the study does not differentiate between the value of public and private rights-of-way. But Schell does not show how Bluebird's submission of this allegedly flawed appraisal would be a material misrepresentation. Absent some evidence that Bluebird knowingly withheld information from the appraisal company material to its valuation of the in-kind contribution or altered the company's report before sending it to the NTIA, Schell has not shown a misrepresentation occurred, much less that any misrepresentation caused the NTIA to disburse money.

Schell also contends Bluebird could have received the rights-of-way from the State of Missouri at no cost (and presumably, for no exchange of services) if it had taken Schell's advice and filed to become a Competitive Local Exchange Company. However, whether Bluebird could have received the rights-of-way in a different manner is irrelevant. Bluebird represented it would receive $10.5 million in in-kind contributions and did so, as evidenced by the independent appraisal and by the NTIA's subsequent approval of the appraisal. Therefore, no genuine issue of material fact exists as to whether Bluebird misrepresented the nature of its in-kind contributions to the NTIA.

### 5. *Management by the Martins and GlenMartin's Involvement*

As a condition of receiving grant funds, Bluebird was not permitted to give GlenMartin a role in managing the grant. Schell appears to argue that Bluebird submitted

a false statement to the NTIA when it said "Christopher Martin and Tatum Martin . . . would not manage [Bluebird's] participation in the grant," [Doc. 1, at p. 13, ¶ 72.d], and that GlenMartin would not manage the grant. [Doc. 88, at p. 61]. Bluebird argues summary judgment is appropriate because Plaintiffs cannot establish a misrepresentation occurred under either theory.

First, Schell concedes that the grant application lists the Martins in various roles such as the grant application point of contact, the environmental point of contact, and as "key individuals" associated with the project. [Doc. 88, at p. 25, ¶ 78]; [Doc. 67-2, at pp. 3-4, 6]. Further, nowhere in the letter provided to the NTIA from Bluebird's managing member does it say the Martins would not have a role in the management of the project. [Doc. 72-27]. Therefore, there is no submissible evidence that Bluebird made any representation concerning the management of the grant by the Martins.

As for GlenMartin's role in managing the grant, Schell submitted an affidavit from Eric Fogle stating Chris Martin, who is both a co-owner of GlenMartin and a co-owner and board member of Bluebird, used GlenMartin funds to purchase domain rights to Bluebird's website. Schell argues this proves that GlenMartin exercised control over Bluebird's email server and had access to project bids as they were emailed to Bluebird. However, Schell has not established how Eric Fogle has personal knowledge that GlenMartin funds were used to purchase Bluebird's domain and provided no evidence beyond Mr. Fogle's affidavit to support that allegation. Nonetheless, even if GlenMartin purchased Bluebird's domain name, Schell has not established when this purchase occurred, whether it occurred after Bluebird's statements to the NTIA, and how

15

GlenMartin's ownership of Bluebird's domain name equates to management of the grant project.

Schell also points to email correspondence by the Martins which came from GlenMartin email addresses. These emails concerned the grant. Schell argues that this shows that GlenMartin was controlling the grant. However, no reasonable jury could conclude that use of a GlenMartin email address by the Martins, who were not restricted from being involved in the management of the grant, shows GlenMartin managed the grant. As discussed earlier, the Martins, who were co-owners of Bluebird, were disclosed to the NTIA as project managers. Further, five of the six emails cited by Schell as proof that GlenMartin managed the grant project are emails from the Martins relating to Bluebird Media's merger with MNA and are clearly statements made in the Martins' capacity as co-owners of Bluebird, not GlenMartin. [Doc. 93-1, Exs. 2-6] (email subject lines such as "Notes for Bluebird/MNA Merger" and "Merger MNA Bluebird"). The seventh email chain cited by Schell is an email chain primarily between Bluebird's managing member and Eric Fogle, where Chris Martin and other board members are included in the "Cc:" line. Chris Martin's only active participation in the email chain was a one sentence email replying to the managing member of Bluebird that a letter to a potential vendor "looks fine to me." No reasonable juror would equate this email with active management by GlenMartin.

Similarly unpersuasive is Schell's argument that GlenMartin managed the project because Chris Martin, in his capacity as a co-owner of GlenMartin, once threatened to use his influence on Bluebird's board of directors to get Eric Fogle fired if he did not

16

award GlenMartin an engineering project. As Mr. Fogle testified in his deposition, GlenMartin did not receive the bid and Mr. Fogle was not fired for refusing to award the bid to GlenMartin. [Doc. 97-2, at p. 4-5]. Furthermore, this is clearly not evidence that GlenMartin was being permitted by Bluebird to manage the grant.

### 6. Bluebird Media's merger with MNA

While the application and due diligence process was ongoing, Bluebird Media merged with MNA to form Bluebird Network. Schell alleges that although Bluebird Media retained a 51% ownership share of Bluebird Network, Bluebird Media's statements that it retained control over the grant project were false because Bluebird Network's board was composed of an equal number of board members from Bluebird Media and MNA.

Bluebird's statements about its control of the grant project were not misrepresentations or false statements because Bluebird disclosed the merger to the NTIA. In January 2011, Bluebird disclosed that the merger would result in a 51/49 ownership split, that Bluebird's board would consist "of five individuals selected by Bluebird Media and five individuals selected by MNA," that "significant operational issues . . . will require a super majority vote" of the board members, and that "all management decisions will be made by a majority vote . . . ." [Doc. 72-2, at p. 6]. Hence, Schell has failed to present evidence that Bluebird made any misrepresentation to the NTIA about Bluebird's control of the project.

Schell has failed to present submissible evidence that Bluebird made material, false statement or submitted material, false claims for payment to the NTIA during either

the application process or grant period. Accordingly, Bluebird's motion for summary judgment is granted as to Count I.

### B. Count II – Retaliation, 31 U.S.C. § 3730(h)

Schell alleges in Count II of his Complaint that he was retaliated against by Bluebird, in violation of 31 U.S.C. § 3730(h), after he was terminated for raising concerns about the adequacy of the State of Missouri's in-kind contribution and Bluebird's practice of "redlining" parts of its service area to avoid competition with MNA. Bluebird argues summary judgment is appropriate because Schell cannot show he engaged in protected activity or that any protected activity contributed to his termination because Bluebird's board did not know of the complaints Schell made.

The False Claims Act's whistleblower protection provision provides relief for employees who engage in conduct protected by the FCA and are discharged, demoted, or experience other discriminatory consequences as a result. 31 U.S.C. § 3730(h). To state a claim for retaliation under the FCA, a plaintiff must show "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004). "Protected activity is established when the employee's actions satisfy two conditions. First, the employee's conduct must have been in furtherance of an FCA action. Second, the employee's conduct must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action." *Id.* at 567.

18

Though in his Complaint, Schell lists several instances where he complained to Eric Fogle about various issues related to Bluebird's grant, at the summary judgment stage, allegations unsupported by fact are insufficient. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As such, the Court will only discuss complaints by Schell that have been supported by an affidavit or other evidence. *Id.*

Schell argues he engaged in protected activity when "prior to and after the merger between" Bluebird Media and MNA, he spoke with Bluebird's CEO, Eric Fogle, and "questioned the validity of the in-kind match arrangement with the State." [Doc. 88, at p. 52, ¶ 184]. Schell contends Fogle informed Bluebird's board of these concerns. [Doc. 88, at p. 52, ¶ 185]. However, there is no evidence that Schell informed Fogle or the board that he believed the in-kind contribution to be illegal or that statements made to the NTIA about the in-kind contribution were fraudulent. *See Schuhardt*, 390 F.3d at 567 (employee provided sufficient evidence to create genuine issue of material fact as to protected activity where employee complained to her supervisor that her employer's billing practices were illegal and fraudulent); *Hutchins v. Wilentz, Goldman & Sptizer*, 253 F.3d 176, 193 (3rd Cir. 2001) (finding that employee did not engage in protected conduct where he did not advise his supervisor that he thought the company's practice was illegal or causing loss of government funds); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (employee's reports to his supervisors were not protected activity because employee never used the terms "illegal," "unlawful," or "qui tam action"); *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (employee engaged in protected activity when she complained about the

19

employer's "unlawful actions" and warned them that they are "incurring significant

criminal and civil liability"); *U.S. ex rel. Parato v. Unadilla health Care Ctr., Inc.*, 787

F.Supp.2d 1329, 1342-44 (M.D. Ga. 2011) (employee engaged in protected activity by

characterizing employer's conduct on several instances as "illegal," in violation of federal

regulations, and "claims fraud" and where she "raised the specter of potential criminal

liability"). Instead, Schell's statements appear to be concerns that the in-kind

contribution would be insufficient to meet Bluebird's fund-matching needs – a

determination Schell was assigned as part of his job. *See* [Doc. 88, at p. 47, ¶ 151] ("Eric

Fogle instructed Martin Schell to prepare analyses of: 1. The value of the in-kind

contribution from the State of Missouri; and 2. The cost of the services being provide

[sic] by [Network] to [the Office of Administration] and the State Fair Commission.");

*see also Schuhardt*, 390 F.3d at 567 (employee performed activities not within her job

duties and therefore, district court erred in finding she did not engage in protected

activity); *Glynn v. Impact Science & Tech., Inc.*, 807 F.Supp.2d 391, 407-8 (D.Md. 2011)

(employee who raised concerns about equipment made by employer and supplied to the

government did not engage in protected activity where employee was performing his job

function as principal engineer); *Maturi v. McLaughlin Research Corp.*, 326 F.Supp.2d

313, 319-20 (D. R.I. 2004) ("numerous courts have held . . . that employee actions that

would otherwise be deemed 'protected conduct' under the FCA cannot sustain an FCA

suit if they fall under the regular responsibilities or duties of that employee; such

employees must 'make clear' that they will bring or assist in an FCA action in order to

overcome the presumption that they are merely acting in accordance with their

employment obligations.").  For the same reasons, Mr. Schell's allegations that he "discussed [the Missouri Department of Transportation] not honoring their agreement to provide $10.5 million in-kind contribution" with a Network board member is insufficient to create an inference of protected activity.

Schell also alleges he expressed concern to Eric Fogle that possible redlining in specific service areas denied "all potential Community Anchor Institutions" the right to receive competitive quotes and to receive service at a lower rate.  Schell alleges the consequences of redlining were "in direct conflict with what was indicated through the Grant Application."  [Doc. 88, at p. 58, ¶ 216]. It is unclear whether Schell expressed to Fogle that Bluebird's actions were "in direct conflict" with the grant application, but even if he did, Schell has not shown that he communicated to anyone that he believed the actions were illegal or fraudulent and has not identified how this practice was a false claim or statement to the government.  Further, had Schell investigated his concerns, he would have discovered that the grant application did not list specific CAIs, that Bluebird did not purport to serve every possible CAI in the area, that Bluebird disclosed to the NTIA that MNA had existing communication lines, and that the NTIA was aware routes of service identified in the grant application would likely change. *See Neighorn v. Quest Health Care*, 870 F.Supp.2d 1069 (D. Or. 2012) (finding that employee did not engage in protected activity by complaining about health care billing practices because had the employee investigated his suspicions, he would have discovered that actions he perceived as requirements for government funds were actually internal, company requirements and not requirements imposed by the government).  Further, Schell can only allege "upon

information and belief" that Bluebird's board, which had the sole power to terminate Schell, knew of this complaint. "Upon information and belief" is insufficient proof at the summary judgment stage and accordingly, even if Schell's statements were protected activity, Schell has failed to establish his employer knew about it.

Schell also argues that he engaged in protected activity when he told Eric Fogle "on multiple occasions of [his] serious concerns on how the Grant was not fulfilling the promises that [Media] had made to the NTIA in being awarded the Grant" and that there could be "consequences to the decisions we made." [Doc. 88, at p. 58, ¶ 215]. It is doubtful that these statements would have put Bluebird's board on notice that Schell believed their actions to be illegal or fraudulent, but even if they did, Schell does not identify which promises he believed to be broken and does not explain how these broken promises constitute a false statement or claim for payment. He has also failed to present evidence other than his own "information and belief" that Bluebird's board knew about these statements or that these statements were the sole reason he was terminated. [Doc. 88, at p. 58, ¶ 217].

There is no genuine issue of material fact as to whether Schell engaged in protected activity or whether Bluebird's board knew about complaints he made. Schell cannot establish a prima facie case of retaliation and Bluebird's motion for summary judgment on Count II is granted.

### C. Count III – Violation of Missouri's Service Letter Statute, Missouri Revised Statute § 290.140

Schell alleges in Count III that Bluebird violated Missouri's service letter statute, § 290.140 RSMo., by failing to state the true cause for which Schell was terminated – his complaints about GlenMartin's involvement in the grant project, the validity of the in-kind contribution, and redlining of Bluebird's service area so as not to compete with existing services offered by MNA.

Under Missouri's service letter statute, § 290.140 RSMo., an employee who is discharged may request a letter from his employer outlining the nature of his employment and truly stating for what cause, if any, the employee was discharged. *See Callantine v. Staff Builders*, 271 F.3d 1124, 1131-32 (8th Cir. 2001). "An employee who is entitled to a service letter has a cause of action if the corporation fails to issue the letter or issues a letter not conforming to all the statutory requirements." *Id.* (internal citation omitted). If the employee proves actual damages, the employer is liable for compensatory damages. Mo. Rev. Stat. Ann. § 290.140(2). Without proof of actual damages but with proof of noncompliance with § 290.140, an employee is still entitled to a judgment for nominal damages, because "[t]he failure to give a proper service letter is an invasion of the employee's legal rights." *Callantine*, 271 F.3d at 1132. Punitive damages are also available where the employee proves malice. *Id.*; *Thompson v. Skelgas, Inc.*, 896 S.W.3d 645, 648 (Mo. Ct. App. 1995). However, a claim for punitive damages is barred as a matter of law when an employee is challenging the substance of a service letter rather than an employer's outright refusal to provide a letter at all. *Hendrix v. Wainwright Indus.*, 755 S.W.2d 411, 413 (Mo. Ct. App. 1988); *see also Moore v. DaimlerChrysler*

*Corp.*, 2007 WL 803498 at *7 (E.D. Mo. 2007) (citing several Missouri cases holding only a failure to issue a service letter justifies a punitive damages award).

It is undisputed Bluebird provided a service letter to Schell, so punitive damages are not available. [Doc. 72-38 – Service Letter].  The only remaining issue is whether Schell is entitled to compensatory or nominal damages if he proves the falsity of the service letter. To prove actual damages, Schell must show he was refused or hindered in obtaining employment due to the absence or inadequacy of a service letter, the positions he was refused or hindered in obtaining were actually open, and the rate of pay for the positions.  *Uhle v. Sachs Elec.*, 831 S.W.2d 774, 777 (Mo. Ct. App. 1992).

Schell admits no prospective employer asked him to produce the service letter and he admits he never provided the service letter to prospective employers.  [Doc. 88, at p. 41 – SOF 117].  As such, Schell has not established any actual damages that occurred as a result of the service letter even if it were false.  Because neither punitive nor compensatory damages are appropriate here, Schell is only entitled to nominal damages should he be able to prove the reasons for termination outlined in the service letter are false.

The only remaining issue, then, is whether Schell has presented evidence from which a reasonable juror could conclude that the service letter stated a false reason for Schell's termination.  The service letter states he was terminated  because his position was eliminated.  Schell argues he was not terminated due to the elimination of his position because his position was "essential to the success of the company and remained essential at all times" and that he was terminated in retaliation for voicing concerns about

24

the grant. As explained previously, Schell cannot establish that he was terminated for engaging in protected activity and the evidence shows that his position was never filled. Therefore no reasonable juror could conclude that the service letter was false. Bluebird's motion for summary judgment on Count III is granted.

## III. Conclusion

For the reasons set forth above, Bluebird's motion for summary judgment on all counts is granted.

<u>s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>February 21, 2014</u>
Jefferson City, Missouri